UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES,**<br><br>v.<br><br>**PATRICK KEOGAN,**<br>**Defendant** | Crim. No. 16-CR-10244-DPW |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Even before his most recent arrest, Defendant Keogan's criminal convictions spanned his 20s, 30s, and 40s. A number were for acts that were violent, cruel, or both. His federal convictions continue that streak of violence and cruelty. He threatened two local Muslim groups with arson, possessed multiple firearms and thousands of rounds of ammunition despite being prohibited as a felon from doing so, and knowingly possessed child pornography.

Whether Defendant Keogan is violent and victimizes other because he drinks too much or for any other reason, he should be deterred specifically from further violence and victimization. He poses a significant danger of reoffending, making it important to keep him imprisoned where he cannot harm society further. And he should be punished significantly so that others who find violence and victimization funny, admirable, or effective will instead understand that society thinks otherwise and will punish this behavior significantly. Finally, Mr. Keogan deserves a significant sentence to punish him and give his victims some measure of justice.

Consequently, the United States moves this Court to sentence Defendant Keogan to 57 months of incarceration, a subsequent 60 months of supervised release, restitution, forfeiture of ammunition, weapons, and electronics containing child pornography, a fine within the guidelines sentencing range of $20,000 to $200,000, and a mandatory special assessment of $5,400, with

the fine and $5,000 of the special assessment to be waived if the Court finds Defendant Keogan unable to pay them.

Defendant Keogan's suggestion that 36 months of incarceration is sufficient but not greater than necessary to achieve sentencing's aims neglects the most important aspects of Keogan and his crimes.  It neglects Defendant Keogan's long criminal history.  It neglects that he has disclaimed any need for the treatment that his counsel now says would benefit him.  It neglects that Defendant Keogan has already received mercy:  the government's 57-month recommendation is at the bottom of the guidelines sentencing range, and below the 60-month mandatory minimum that would have applied had he been charged with receipt of child pornography under 18 U.S.C. § 2252.  It neglects that a 36-month sentence amounts to only 9 months apiece for each of the four separate crimes he has added to his record.  And, most tellingly, it neglects the fact that these crimes were not harmless:  there were victims.

Against this, Keogan gives few reasons for a departure or variance other than that his friends, family, and coworkers like him and consider him a hard worker and kind to animals.

**I.     FACTS**

The facts are familiar from the plea and the presentence report.  The following facts therefore highlight the factual issues specifically relevant to sentencing.

### A.     Defendant Keogan Is Violent and Victimizes Others

Defendant Keogan is a married man who lives with his wife, his son, and his parents at the house in which he grew up.  PSR ¶¶ 90, 92, 93, 96-98.  He is a skilled tradesman.  PSR ¶ 110.  He and his wife make an income solidly in the middle class.  PSR ¶ 111.

Despite these advantages, Defendant Keogan has a history of violence and victimizing others.  In 1990, he was convicted of the malicious destruction of property at age 18.  PSR ¶ 72.

In 2006, he was convicted of assault and battery with a dangerous weapon for punching a man in the face while the man was sitting in a car, and then, when the man tried to leave the car, kicking the man in the face several times with work boots, and stealing his wallet.  PSR ¶ 78.  In 2013, he was reported to have threatened to kill senators and congresspeople (but, to be fair, denied doing so and was never charged or convicted).  PSR ¶ 16.  In 2013, he was convicted of sending 38 text messages to a man who had helped get Defendant Keogan fired.  The text messages included videos and pictures of a beheading and of a fictional serial killer.  Defendant Keogan promised, "I will after I fuck you up and rape your face faggot," and then promised to attack the man's daughter, too.  PSR ¶ 79.  He praised arson and vandalism against Muslims at least as early as 2013.  PSR ¶ 20-23.  And in 2015, he threats Muslim groups and possessed multiple images showing the victimization of children.

Maybe this history is a result of heavy chronic alcohol consumption.  *See* PSR ¶¶ 99, 105.  Maybe it is a result of supposed psychological pressures.  *See* PSR ¶¶ 102-103.

But whatever the source, it is a part of his character that is unlikely to change:  Defendant Keogan did not stop drinking after two OUIs, even after in-patient hospitalization.  *See* PSR ¶¶ 75, 77, 108.  And Defendant Keogan thinks that he does not need counseling.  PSR ¶ 103.

      **B.**      **Threats of Arson Against Muslims — Counts 1 and 2**

On November 13, 2015, terrorists attacked Paris.  ISIS claimed responsibility.

Defendant Keogan responded the next day.  He did not respond by threatening ISIS.  Instead, he threatened arson against two Boston-area Muslim groups.  PSR ¶¶ 9-10.  He posted the threats on the groups' Facebook pages, PSR ¶ 11, thereby ensuring that the groups saw the threats, and hoping to provoke a reaction.  PSR ¶ 13.  This is what they saw:



The groups had good reason to fear these threats. Islamophobia, especially Islamophobia unfairly sparked by terrorist attacks, could bring dangerous repercussions. One victim, the Islamic Society of Boston Cultural Center, has a mosque, and this post threatened to burn it down. Arson can claim not only buildings, but also lives. And arson needs no special planning or technology: it needs only gasoline and a match.

The victims also had reason to fear Defendant Keogan more specifically. He was brazen: he used what appeared to be (and turned out to be) a real name and a picture of his face. Moreover, his posts indicated that he was from Wilmington, Massachusetts. PSR ¶ 13. He hadn't threatened arson from halfway across the world: he was less than 20 miles away.

In the days afterward, Defendant Keogan did not regret making these threats. Just the opposite. A day after threatening the ISBCC, he went back into Facebook and "liked" his picture

in the threat.  *See* Transcript of Detention & Probable Cause [Dkt. # 20] at 39:15-21.  A couple days later, he praised burning mosques more privately on his own Facebook page.  PSR ¶ 23.

The reason that Defendant Keogan had no regrets was that his threats expressed his deepest beliefs.  He admired Nazis and Nazi imagery.  He proudly posted a picture in which he had taped four high-capacity gun magazines together into a swastika and claimed "Swastimag is best mag."  PSR ¶ 17-18.  He hated Islam and Muslims.  PSR ¶¶ 19-23.  He kept a bumper sticker at home proclaiming "Fuck Islam."  PSR ¶ 19.  On Facebook, he called himself "Patrick BanIslam Keogan" and "Patrick KillsMuslims Keogan."  *Id.*  He praised vandalism to mosques as early as 2013, when he called the arsonist of a Missouri Islamic Center's roof "an unknown hero . . . [t]he people's champion.  A true God amongst mortal men."  PSR ¶ 22.  In 2015, he sought people to "go fuck up" a support rally for another mosque.  PSR ¶ 22.

Defendant Keogan objects that highlighting his religious and racial animosity is unfairly inflammatory and prejudicial.  To the contrary.  Defendant Keogan's religious and racial animosity demonstrate that his threats were not a mistake, not just the alcohol talking, and not out of character.  And because the Court must assess whether Defendant Keogan will again threaten people, Defendant Keogan's hate for broad groups of people will better predict future threats to people than will his love for birds and turtles.

Finally, Defendant Keogan's assurances that he did not intend to harm Muslims or damage mosques, PSR ¶ 14, brings cold comfort.  The harm was already done:  he sought to provoke a reaction and he succeeded.  The threats had been made, his victims were concerned, and law enforcement was activated.

    **C.**     **Child Pornography — Count 4**

Defendant Keogan's iPhone and iPad contained about 50 images of child pornography.

PSR ¶¶ 28, 30.  He must have understood how wrong this was.  He kept software to hide videos or pictures from others.  PSR ¶ 29.  Although the FBI did not analyze specifically whether he used the software to hide his child pornography, *id.*, it seems likely.

### D. Possession of Weapons and Ammunition — Count 3

Even before his current federal convictions, Defendant Keogan was a felon twice-over (OUI 2nd and assault and battery with a dangerous weapon).  *See* PSR ¶ 24; Complaint Aff. [Dkt. # 3-1] ¶ 28.  Consequently, he could not possess firearms and ammunition lawfully.

He did so anyhow.  Seized from his house were thousands of rounds of ammunition and 50 firearms.  PSR ¶¶ 26, 27; Plea Agreement [Dkt. # 49] § 3.  Of the 50 firearms, the parties agree that Defendant Keogan possessed 8 to 24.[1]  The government does not allege that all 50 firearms were his:  four other people lived at the house, two of whom had carried or owned firearms in the past, and DNA-testing never sorted out which were whose.  The government does allege, however, that the most plausible estimate of the firearms attributable to Defendant Keogan is 24 rather than 8.  On the same day that Defendant Keogan posted his "Swastimag" photograph, he posted a photograph of himself with 6 black rifles and 1 black shotgun, and yet another of himself with 13 rifles with wooden stocks.  Complaint Aff. [Dkt. # 3-1] ¶¶ 40, 43.  He also built guns.  *See id.* ¶¶ 33, 37-39.  Even his kitchen held a gun, gun parts, and gun cleaning supplies.  *See* Transcript of Detention & Probable Cause [Dkt. # 20] at 15:1-24.  So the best estimate is closer to 24 firearms.

---

[1] The portion of the ammunition that Defendant Keogan possessed does not affect the sentencing guidelines. But given that he possessed 24 out of 50 firearms seized, it is fair to estimate that he possessed a little under half of the thousands of rounds of ammunition.

And not just any firearms. They included not only an AK-47-type assault rifle, but also light machine guns. PSR ¶ 26.

This could have been a dangerous combination with his alcohol consumption and history of violence.

## II.     SENTENCING GUIDELINES

Although the parties and Probation agree on the applicable sentencing guidelines, the guidelines merit a brief discussion to reassure the Court that they qualitatively reflect the defendant's culpability.

### A.     Threats of Arson Against Muslims — Counts 1 and 2

The calculations for the threat convictions are governed by USSG § 2A6.1. This guideline sets a base level of 12, USSG § 2A6.1(a)(1), PSR ¶¶ 36, 42, which recognizes that threats make victims fear for their person and property, disrupt their lives, and require law enforcement officers to respond to the threats and investigate them. The guideline further reflects a defendant's culpability by imposing upward adjustments for threats made under a variety of aggravating circumstances or with aggravating results, but none of those apply here. The guideline also reflects a defendant's culpability by imposing a downward adjustment for a single threat made with "little or no deliberation," USSG § 2A6.1(b)(6), but that does not apply here because Defendant Keogan acted with deliberation (by, for example, searching for his victims' Facebook pages, PSR ¶¶ 10, and liking his picture on the ISBCC's page, Transcript of Detention & Probable Cause [Dkt. # 20] at 39:15-21).

The calculations for the threat convictions are also governed by the hate crime guideline, USSG § 3A1.1(a). *See* PSR ¶ 38, 44. This guideline reflects a defendant's culpability by

increasing the offense three levels because nobody should be threatened with violence just because of their (in this case) religion.

The guidelines therefore reflect Defendant Keogan's culpability for the threats of arson against Muslim groups.

### B.  Possession of Weapons and Ammunition — Count 3

The calculations for the felon-in-possession conviction are governed by USSG § 2K2.1. The base offense level reflects a defendant's culpability by varying anywhere from 6 to 26, depending on various aggravating factors.  Here the base offense level is 20 because Defendant Keogan was a felon and possessed at least one firearm described at 26 U.S.C. § 5845(a) (a machinegun).  USSG § 2K2.1(a)(4)(B); PSR ¶ 48.  This serious base offense level reflects that felons should not have firearms, especially machineguns.  The offense level is increased an additional 4 levels because the offense involved between 8 and 24 firearms.  USSG § 2K2.1(b)(1)(B); PSR ¶ 49.  The number of firearms reflects culpability as well:  the more firearms a defendant possesses, the greater his disregard for the law.

The guideline does not adjust the offense level based upon the volume of ammunition. But Defendant Keogan possessed an immense volume, which supports the seriousness of assigning adjusted offense level 24 to this offense.

### C.  Child Pornography — Count 4

The calculations for the child pornography conviction are governed by USSG § 2G2.2. The base offense level of 18, USSG § 2G2.2(a)(1), PSR ¶ 54, reflects a defendant's culpability because it is loathsome to obtain satisfaction through the victimization of children.  The guideline also reflects a defendant's culpability by imposing a number of potential upward adjustments that do not apply here, such those for producing or profiting from child

pornography. What do apply are the adjustments for pornography involving a prepubescent minor or minor younger than twelve (USSS § 2G2.2(b)(2)) and for 10 to 149 images (USSG § 2G2.2(b)(7)(A)). PSR ¶¶ 55, 57. They reflect greater culpability because Defendant Keogan's victims were younger and because the more distinct images, the greater the number of victims or the greater the number of distinct victimizations.

### D.  Grouping Analysis

Although grouping analysis usually gets little attention, it should here. On a technical level, the grouping analysis adds another two levels because Defendant Keogan's crimes fall into four different groups with varying adjusted offense levels. PSR ¶¶ 35, 62-64. On a conceptual level, this reflects that Defendant Keogan committed not just one crime charged four ways, but rather four distinct and separate crimes. Their variety reflects a broad streak of criminality based on cruelty, a need to dominate, and indifference to legal and moral norms. The two-level grouping increase rightly recognizes and punishes this.

### E.  Combined Adjusted Offense Level After Acceptance of Responsibility

The combined adjusted offense level is 26, PSR ¶ 65, but is decreased by 3 levels to reflect acceptance of responsibility early enough to permit the government and the Court to allocate their resources efficiently, PSR ¶¶ 67-69.

The resulting total offense level is 23. While this offense level is significant for a person with minimal or no criminal history, it is even more significant for a person whose criminal history is as serious as Defendant Keogan's CHC III. Consequently, the resulting sentencing guideline range is 57 to 71 months of incarceration. PSR ¶ 118.

### III.  SENTENCING ARGUMENT, INCLUDING 18 U.S.C. § 3553(A) FACTORS

Defendant Keogan deserves 57 months of imprisonment because his offenses were

serious, his long history of criminal acts include violence and victimization, he deserves punishment for continuing to disrespect the law and other people, other people with Defendant Keogan's inclinations should be deterred from acting on those inclinations, he poses a significant risk of reoffending, and 57 months is parsimonious.

    A.    **The Offenses' Nature and Circumstances, and the Defendant's History and Characteristics (18 U.S.C. § 3553(a)(1))**

Defendant Keogan's history and characteristics include earlier crimes of violence and victimization. His current threats and child pornography crimes follow the same pattern.

Defendant Keogan's history and characteristics also include repeated disregard for the law and for prior warnings. The nature and circumstances of his current crimes follow the same pattern. He threatened two mosques in 2015, even though in 2013 law enforcement officers visited him about one set of possible threats and he was convicted of making another set of threats. He possessed firearms and ammunition even though his felony convictions prohibited him from doing so. And he possessed child pornography against all prohibition.

    B.    **Seriousness of the Offense, Respect for the Law, and Just Punishment (18 U.S.C. § 3553(a)(2)(A))**

These are serious offenses.

In Counts 1 and 2, Defendant Keogan threatened two separate Muslim groups with arson. He did so to provoke a reaction. He succeeded. The groups were concerned, they contacted law enforcement agencies, and those agencies spent significant resources investigating him.

In Count 3, Defendant Keogan possessed not just one gun, but an arsenal.

In Count 4, Defendant Keogan possessed child pornography. Although other defendants have possessed far greater collections of child pornography, the children depicted in Defendant Keogan's collection nevertheless suffered and their impact letters are no less heart-breaking.

Sentencing Defendant Keogan to only 9 months per offense, as he suggests, would not convey just punishment to the victims or to the rest of society. The victims deserve better.

### C. General Deterrence (18 U.S.C. § 3553(a)(2)(B))

Hate crimes are on the rise generally, and specifically against Muslims. "The overall partial 2017 increase for all the thirteen survey cities rose from 690 to 827 or 19.9 percent over the same period last year. If these latest increases hold for all of 2017 – across the whole country – it would mark the third consecutive year of annual national increases, something not seen since 2004 . . . ." *Final U.S. Status Report: Hate Crime Analysis & Forecast for 2016/2017: Compilation of Official Vetted Police Data from over 40 U.S. Cities, Counties and States* at 3, Center for the Study of Hate & Extremism at California State University, San Bernardino, available at https://csbs.csusb.edu/sites/csusb_csbs/files/Final%20Hate%20Crime%202017%20Status%20Report%20pdf.pdf. Hate crimes are on the rise against Muslims. "Of the seven cities that broke down anti-Muslim hate crime, six saw increases . . . ." *Id.* at 11. "Recent polls show sustained levels of anti-Muslim prejudice in the high thirty to mid forty percent range in the United States, a level higher than after 9/11." *Id.* at 13.

The criminal justice system cannot solve this or almost any other problem on its own. But neither can it shrug its shoulders helplessly. General deterrence through sentencing might be uncertain. But general encouragement through minimal punishment is predictable. Sentencing Defendant Keogan to only 36 months, well below the bottom of the guideline sentencing range, could do just that.

### D. Specific Deterrence (18 U.S.C. § 3553(a)(2)(C))

The strongest case for a 57-month sentence is the need to specifically prevent Defendant Keogan from reoffending. His risk of reoffending is very high.

Defendant Keogan's sentencing memorandum suggests that he has finally learned his lesson. On what evidence? Defendant Keogan does not learn from his mistakes:

- He reoffended throughout his 20s, 30s, and 40s.

- Despite two OUI convictions, he kept drinking heavily.

- Despite a 2013 conviction for making threats and a visit from law enforcement about other reported threats, in 2015 he threatened people again.

- Despite prohibitions from possessing firearms and ammunition following his two felony convictions, he proudly shot, posed with, and built multiple firearms and possessed a trove of ammunition.

And Defendant Keogan's original motives for his hate crimes persist. Bigotry and anti-Islamic animus are part of Defendant Keogan's character that will not have passed with his arrest. If anything, his bigotry and animus have likely increased now that they have landed him in jail. They, combined with his history of violence and victimizing others, suggest that he will victimize others after prison.

Defendant Keogan's risk of reoffending will not decrease just because he will return home to a loving family. That same loving family was there in 2015 when he committed the four instant crimes. Nothing suggests that it will serve him better the next time around.

Finally, Defendant Keogan all but admitted to Probation that he sees no reason to change. His counsel blames his crimes on heavy drinking and unresolved mental issues. Yet Defendant Keogan himself sees no need for counseling.

The Court should therefore impose a 57-month sentence of incarceration if for no reason other than to prevent Defendant Keogan from reoffending

### E.    Parsimony Principle (18 U.S.C. § 3553(a))

Finally, a 57-month sentence would respect the principle of parsimony of imposing a sentence sufficient to address sentencing objectives but no greater than necessary. Defendant Keogan has already received mercy from a sentencing recommendation at the bottom of the guidelines sentencing range and below the 60-month mandatory minimum that would have applied had he been charged with receipt of child pornography under 18 U.S.C. § 2252. A 36-month sentence for four distinct felonies would seriously understate the seriousness of those offenses, the length of his criminal history, the effect he had on victims, the need for just punishment, his risk of reoffending, and the respect due for the law.

## CONCLUSION

For all these reasons, the Court should impose a sentence of 57 months of incarceration, a subsequent 60 months of supervised release, restitution, forfeiture of ammunition, weapons, and electronics containing child pornography, a fine within the guidelines sentencing range of $20,000 to $200,000, and a mandatory special assessment of $5,400, with the fine and $5,000 of the special assessment to be waived if the Court finds Defendant Keogan unable to pay them.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    */s/ Scott L. Garland*
Scott L. Garland
Assistant U.S. Attorney

Date: September 23, 2017

## CERTIFICATE OF SERVICE

I hereby certify that this document will be filed through the ECF system and therefore will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

>   */s/ Scott L. Garland*
>   Scott L. Garland
>   Assistant United States Attorney

Date: September 23, 2017