## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **UNITED STATES,** <br><br> **v.** <br><br> **PATRICK KEOGAN,** <br> **Defendant** | **Crim. No. 16-CR-10244-DPW** |

### GOVERNMENT'S POST-EVALUATION SENTENCING MEMORANDUM

Following Mr. Keogan's mental health evaluation, the United States recommends a sentence of 57 months of incarceration, a subsequent 60 months of supervised release, restitution, forfeiture of ammunition, weapons, and electronics containing child pornography, and a $400 special assessment.  The United States does not seek a fine or the enhanced special assessment payable in child pornography cases because Mr. Keogan appears unable to pay a fine or anything above the standard $400 special assessment, even on a reasonable installment plan.

This memorandum briefly recommends how the Court should evaluate and weigh the 18 U.S.C. § 3553(a) factors in light of the evaluation and the Court's questions at the earlier sentencing hearing.

## I.    NATURE AND CIRCUMSTANCES OF THE OFFENSES – 18 U.S.C. § 3553(A)(1)

Mr. Keogan committed four crimes.  The first two were threats to Muslim groups to burn down a mosque.  These crimes had victims, who were targeted for their religion.  Although Mr. Keogan might have made the threats while under the influence of alcohol, the threats nevertheless voiced prejudices that he held and voiced when sober.  The third crime was the possession as a prohibited person of multiple firearms and thousands of rounds ammunition,

likely for hobbyist purposes.  The fourth crime was the possession of a small amount of child pornography.

## II.   HISTORY AND CHARACTERISTICS OF THE DEFENDANT – 18 U.S.C. § 3553(A)(1)

Mr. Keogan's criminal history is lengthy, spans a long period, includes crimes of violence, has included incarceration, and has continued into middle age.  He has a long history of alcohol abuse; he denies that it is a problem and denies the need for treatment.  He also has a history of intolerant views toward minorities that motivated the threats he made in this case.  The evaluation suggests that Mr. Keogan believes that his prosecution was unwarranted and unfair, and that his crimes were not serious.  Finally, Mr. Keogan appears to have little support from his family members, who have largely not visited him in prison.

## III.   REFLECTING THE SERIOUSNESS OF THE OFFENSES, PROMOTING RESPECT FOR THE LAW, AND PROVIDING JUST PUNISHMENT – 18 U.S.C. § 3553(A)(2)(A)

### A.   Seriousness of the Offenses

These are serious offenses.

A threat is a serious offense.  It is a crime of violence.  *See* 18 U.S.C. § 16(a) ("The term 'crime of violence' means — (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another . . .").  A threat is not just a physical injury that never came to be.  Rather, a threat is an instrument to cause the victim fear.  Fear is the injury.[1]  In this case, Mr. Keogan admitted that he made his threats to provoke a

---

[1] Another injury is the diversion of law enforcement officers to evaluate whether the threatener will carry out the threat.  But in this case, the primary injury is the victims' fear.

2

reaction, and the victims have told the Court that he succeeded.  Compounding the seriousness of

Mr. Keogan's threats are two other factors.  First, Mr. Keogan targeted organizations, not

individuals.  In other words, he wanted not just to scare one or two people, but whole groups.

Second, he targeted not just any groups, but rather groups who practice a minority religious faith

that has in recent years been scapegoated and attacked heavily in the United States.[2]

Mr. Keogan's possession of firearms and ammunition after felony convictions is also

serious.  It might appear not to be serious because, as the government concedes, there is no

evidence that Mr. Keogan stockpiled these weapons in order to hurt people and there is evidence

that he instead kept them as an aficionado or hobbyist.  But it is serious for four reasons.  First,

Mr. Keogan's possession of firearms and ammunition were prohibited twice over by not just one,

but two, prior felonies.  He had ample notice.  Second, Mr. Keogan had access to a large number

of firearms and a very large quantity of ammunition.  The numbers matter.  Third, Mr. Keogan

had light machine guns and to high-capacity magazines.  The type matters.  Fourth was the risk

---

[2] Hate crimes are on the rise generally, and specifically against Muslims.  As quoted in the government's earlier sentencing memorandum:  "The overall partial 2017 increase for all the thirteen survey cities rose from 690 to 827 or 19.9 percent over the same period last year.  If these latest increases hold for all of 2017 – across the whole country – it would mark the third consecutive year of annual national increases, something not seen since 2004 . . . ." *Final U.S. Status Report: Hate Crime Analysis & Forecast for 2016/2017:  Compilation of Official Vetted Police Data from over 40 U.S. Cities, Counties and States* at 3, Center for the Study of Hate & Extremism at California State University, San Bernardino, available at https://csbs.csusb.edu/sites/csusb_csbs/files/Final%20Hate%20Crime%2017%20Status%20Repo rt%20pdf.pdf.  Hate crimes are on the rise against Muslims.  "Of the seven cities that broke down anti-Muslim hate crime, six saw increases . . . ." *Id.* at 11.  "Recent polls show sustained levels of anti-Muslim prejudice in the high thirty to mid forty percent range in the United States, a level higher than after 9/11." *Id.* at 13.

of his using the firearms while under the near daily influence of excess alcohol or uncontrolled anger.

Mr. Keogan's possession of child pornography is serious because it involved victims and vulnerable ones at that. The government concedes that the number of images for which Mr. Keogan was charged is minimal compared to the number possessed in other cases. But the possession of child pornography is serious regardless of its scope.

### B.      Promoting Respect for the Law[3]

The need for the Court's sentence to promote respect for the law in the face of serious offenses need not be belabored. An insubstantial sentence for a serious offense can convey to the public that the law does not matter. This can undermine the public's respect for not just the law that the defendant violated, but also for the legal system in general.

In this case, the law that needs the most respect is the law that prohibits true threats.[4] Online discourse has simultaneously deteriorated in quality and made it easier to broadcast threats. Threats posted online condition like-minded but less vocal readers to believe that posting threats will be tolerated, that it is the new normal. This is all the more true with threats against followers of a minority faith in the United States, where Islamophobia, though unwarranted, is unfortunately common. By imposing a substantial sentence here, the Court can

---

[3] This subsection addresses promoting respect for the law to the general public rather than to Mr. Keogan. Mr. Keogan's disrespect for the law is addressed below.

[4] The government understands that this argument is not reflected in this case's sentencing guideline calculations, which are dominated by Mr. Keogan's other crimes. The government stands by this argument nonetheless.

promote, even create, respect for the law that posting true threats, especially true threats against minority religions, are illegal.

### C.     Just Punishment

Mr. Keogan's crimes also deserve a substantial sentence to achieve just punishment, that is, an assessment of blame and a measure of retribution.

To the extent that just punishment requires retribution, Mr. Keogan deserves retribution for making threats and possessing child pornography, both of which harmed multiple victims' sense of dignity and well-being.

To the extent that just punishment requires an assessment of blame,[5] Mr. Keogan again deserves a significant sentence.  There are four "functions of punishment-as-expression-of-blame . . . :  it can promote authoritative disavowal of the offense, symbolic nonacquiescence in the offense, vindication or reaffirmation of the law, and absolution of others who might have been suspected of the offense."[6]  Blaming occurs when "some person or group of persons . . . feel the attitudes of resentment and indignation . . . and express their judgments of disapproval and

––––––––––––––––––––––

[5] *See* Carol S. Steiker, *Punishment and Procedure: Punishment Theory and the Criminal-Civil Procedural Divide*, 85 Geo. L.J. 775, 803 (Apr. 1997) (summarizing views on what "distinguishes mere penalties or price-tags from true punishments: punishment expresses attitudes of resentment and indignation and judgments of disapproval and reprobation on the part of the punishing authority himself or of those in whose name the punishment is inflicted," such that "[i]n short, punishment expresses blame, and it is through this expression that we recognize certain actions as punishment") (citation, footnotes, and internal quotation marks omitted).

[6] *Id.* at 804 (citing prior work).

reprobation through the act of punishing."[7]  "[B]laming [also] occurs . . . when it is made clear to

a *wrongdoer* that his or her behavior falls into the category of that which is the proper subject of

collective condemnation."[8]  Finally, punishment-as-blaming "communicates not only with the

wrongdoer, but with the victim and the particular community affected by the act of wrongdoing

(as distinct from the community that designated the category of behavior as deserving of

condemnation in the first place)."[9]

While all of Mr. Keogan's crimes deserve blame, this is particularly true of the threats.

Not because threats are inherently more morally culpable than the other charges, but because

threats hurt victims while parts of society see racist threats as blameless.  The Court can play an

important societal function in placing blame where it lies.

## IV.    ADEQUATE DETERRENCE TO CRIMINAL CONDUCT – 18 U.S.C. § 3553(A)(2)(B)

Punishing a criminal for the purpose of public deterrence is utilitarian.  On its own

utilitarian terms, public deterrence should be sought only if public deterrence will occur or is

likely to occur.

The government understands that there is considerable debate about the extent to which a

criminal sentence actually deters members of the public from committing similar crimes out of

fear of similar punishment.  Along these lines, the government understands that giving Mr.

---

[7] *Id.* at 805 (internal quotation marks and footnote omitted).

[8] *Id.* (emphasis in original; internal quotation marks and footnote omitted).

[9] *Id.*

Keogan a significant sentence will likely have little value in deterring the public from committing felon-in-possession and child pornography crimes.  In Mr. Keogan's case, he is seen primarily as a threatener of Muslim groups, and his other crimes seem relevant to the public primarily because they were uncovered in the context of his threats.

But a significant sentence would be likely to deter similar racist threats.  Mr. Keogan's case was of public interest when it was announced, and the public continues to be interested in online discourse and racist threats.  Moreover, threats made online suffer from network effects.  That is, when someone surfing the Internet sees a threat online, he may conclude that the norms of public discourse have changed to allow such discourse free of penalty.  A significant sentence that reaffirms that such discourse is prohibited could readjust those public norms.

## V.   PROTECTING THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT – 18 U.S.C. § 3553(A)(2)(C)

A significant sentence would also protect the public from further crimes by Mr. Keogan.  There is good reason to believe that Mr. Keogan will re-offend.  He has committed crimes over a long period that has persisted through his middle age.  He appears to resist the idea that his conduct was blameworthy.  He also appears to resist the idea that his drinking affects his judgment.  He can expect little support from his family when he leaves prison.  All of these conditions led Mr. Keogan to be classified as a moderate to high risk for future violence and threats against others, and unlikely to comply with restrictions unless he is under strict supervision.  These conditions all call for a significant period of incarceration.

That all said, the government accepts the evaluation's assessment that Mr. Keogan is at low risk of committing future child pornography offenses.  Consequently, any component of the

sentence based on specific deterrence likely need not focus on specific deterrence of child

pornography offenses.

VI.     **PROVIDING THE DEFENDANT WITH NEEDED EDUCATIONAL OR
        VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL
        TREATMENT IN THE MOST EFFECTIVE MANNER – 18 U.S.C. §
        3553(A)(2)(D)**

Even if Mr. Keogan would respond to training, care, or correctional treatment, the Court

could not use these needs to impose or increase a sentence of imprisonment.  *See* 18 U.S.C. §

3582(a) (requiring sentencing court to consider § 3553(a) factors while "recognizing that

imprisonment is not an appropriate means of promoting correction and rehabilitation"); *Tapia v.

United States*, 564 U.S. 319, 332 (2011) ("And so this is a case in which text, context, and

history point to the same bottom line: Section 3582(a) precludes sentencing courts from

imposing or lengthening a prison term to promote an offender's rehabilitation.").

VII.    **PARSIMONY PRINCIPLE – 18 U.S.C. § 3553(A)**

A 57-month sentence would respect the principle of parsimony of imposing a sentence

sufficient to address sentencing objectives but no greater than necessary.  A 36-month sentence

for four distinct felonies would seriously understate the seriousness of those offenses, the length

of his criminal history, the effect he had on victims, the need for just punishment, his risk of

reoffending, and the respect due for the law.

## CONCLUSION

For all these reasons, the Court should impose a sentence of 57 months of incarceration, a

subsequent 60 months of supervised release, restitution, forfeiture of ammunition, weapons, and

electronics containing child pornography, and a mandatory special assessment of $400.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:   */s/ Scott L. Garland*
Scott L. Garland
Assistant U.S. Attorney

Date:   March 23, 2018

## CERTIFICATE OF SERVICE

I hereby certify that this document is being filed through the ECF system and therefore will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

*/s/ Scott L. Garland*
Scott L. Garland
Assistant U.S. Attorney

Date:   March 23, 2018